**In re 131 LIQUIDATING CORP. fka/fdba Alexander Doll Company, Inc., Debtor.**

**131 Liquidating Corp. fka/fdba Alexander Doll Company, Inc., Debtor/Counterclaimant,**

**and**

**Jeffrey Chodorow, Linda Chodorow, Jack Polsenberg, Gerald Broker, and Sydell Smith, Third–Party Plaintiffs,**

**v.**

**Lasalle Capital Group, Inc., Charles S. Meyer, William V. Glastris, Jr. and Arthur M. Peisner, Defendants.**

**Lasalle Capital Group, Inc., Counterplaintiff,**

**v.**

**Jeffrey Chodorow and Ira Smith, Counterdefendants.**

**No. 97 CIV. 4641(MGC).**

United States District Court, S.D. New York.

April 12, 1999.

Fisher, Fisher & Berger, New York by Laurence J. Kaiser, for Debtor.

Burns Handler & Burns LLP, New York by Arthur M. Handler, Special Litigation Counsel for Debtor and for Third–Party Plaintiffs.

Robert J. Rubin, Camden, ME, for Defendants.

Altheimer & Gray, Chicago, IL by Theodore J. Low, for Defendants.

## OPINION

CEDARBAUM, District Judge.

131 Liquidating Corp., fka/fdba Alexander Doll Company, Inc., (the "Debtor") seeks partial summary judgment precluding any recovery by LaSalle Capital Group, Inc. ("LaSalle") of expectancy damages for the Debtor's alleged breach of the exclusivity provision of a certain letter of intent. Because the Debtor did not enter into the deal contemplated by the letter of intent with either LaSalle or a different source of financing, the motion is granted.

## BACKGROUND

The Debtor and LaSalle executed a letter of intent dated January 24, 1995 (the "Letter of Intent") in which the Debtor agreed to negotiate exclusively with LaSalle to arrange a recapitalization package for the Debtor. (Kaiser Aff. Ex. A at 1, 4).

The Debtor needed the financing in order to exercise an option to repurchase its debt to National Westminster Bank, USA ("NatWest"). In 1994, the Debtor owed approximately $26 million to NatWest, which held security interests in essentially all of the Debtor's assets. (Glastris Aff. ¶ 4). The debt was impairing the Debtor's ability to meet its unsecured obligations. The Debtor negotiated an Option from NatWest whereby the Debtor could repurchase the NatWest debt for $12.5 million on or before December 27, 1994 (the "Option"). (Debtor Mem. at 3; Glastris Aff. ¶¶ 4, 6). In late December 1994, the Debtor paid $1.25 million towards the price of the Option in order to extend the Option to March 27, 1995. (Debtor Mem. at 3; Glastris Aff. ¶ 8).

Pursuant to the Letter of Intent LaSalle was to arrange the financing that the Debtor needed to exercise the Option. The parties undertook to use "best efforts" to close on or before March 27, 1995, the Option's expiration date. (Kaiser Aff. Ex. A at 5). The Letter of Intent outlined the terms for the proposed financing. It specified that the Debtor would borrow through several tranches of debt and that LaSalle's principals and the lenders would purchase 51% of the equity in the recapitalized Debtor. (Kaiser Aff. Ex. A at 3). The original shareholders would receive a distribution of up to $1.5 million in cash and 40% of the stock in the new entity. They would also be represented on the board of directors. (Kaiser Aff. Ex. A at 2). However, the parties understood that the above terms were just a preliminary, non-binding sketch of the deal. The Letter of Intent expressly provides:

> Since this is a letter of intent, the parties shall not be deemed to have entered into a legally binding contract by signing this letter, with the exception of the binding agreements of the parties in the "Exclusivity" and "Public Disclosure" sections herein, and the Purchase Agreement, when executed, will be the binding agreement with respect to this transaction.

(Kaiser Aff. Ex. A at 4).

In the exclusivity section of the Letter of Intent, the Debtor agreed that it would not discuss a possible refinancing deal with anyone but LaSalle. The exclusivity provision provides:

> Alexander agrees that, unless negotiations between LaSalle and Alexander are terminated in writing (it being understood that Alexander will not unilaterally terminate negotiations so long as LaSalle is proceeding in good faith), it will not discuss a possible sale of or refinancing of Alexander with any other party. Notwithstanding the above, Alexander will be free to discuss refinancing or sale of the company with other parties in the event that LaSalle does not produce written financing term sheets for the Subordinated financing within 21 days of [the] execution date hereof and for the Senior financing within 30 days of the execution date hereof. Upon execution of this letter, LaSalle will promptly identify its proposed lending sources and schedule meetings between Alexander and these lending sources.

(Kaiser Aff. Ex. A at 4).

There is evidence that once negotiations were underway, LaSalle proposed certain fundamental changes to the terms outlined in the Letter of Intent, such as casting the deal as an asset purchase rather than a stock purchase and giving the existing shareholders only an indirect equity interest in the new company. (Kaiser Aff. Exs. B, K, L, M).

On March 10, 1995, Debtor tried to terminate its relationship with LaSalle so that it could proceed with a different source of financing, Gefinor Acquisition Partners. (Rubin Aff. Ex B). On the same day, the Debtor paid NatWest $250,000 to extend the Option until April 14, 1995. (Debtor Mem. at 7; Kaiser Ex. C at 2).

On or about March 13, 1995, LaSalle sued the Debtor in Illinois state court alleging breach of the exclusivity provision in the Letter of Intent, since the Debtor had negotiated with competitors of LaSalle. (Kaiser Ex. C at 3). The Debtor removed the action to the United States District Court for the Northern District of Illinois, which, on March 16, 1995, issued a temporary restraining order ("TRO") enjoining the Debtor from negotiating with anyone but LaSalle. (Kaiser Aff. Ex. C at 3, 4).

The parties then resumed negotiations, but they never executed a Purchase Agreement. *Id.* On or about April 6, 1995, LaSalle notified the Debtor that its proposed mezzanine lender would be unable to fund a transaction for at least 20 days, and therefore, LaSalle would be unable to close by April 14, 1995, the expiration date of the Option. *Id.* On April 10, NatWest declined to extend the deadline for exercising the Option, and the district court in Chicago lifted the TRO, enabling the Debtor to negotiate with other capital providers. (Kaiser Aff. Ex. B at 68). In the following four days, the Debtor did not close a transaction with LaSalle or anyone else. Instead, on April 14, 1995, the Debtor filed its chapter 11 petition in the bankruptcy court of the Southern District of New York, sued NatWest, and obtained a TRO extending the NatWest Option. Thereafter, it completed a transaction approved by the bankruptcy court. (Kaiser Aff. Ex. C at 4).

The parties stated at oral argument that the exclusivity provision in the Letter of Intent, by barring the Debtor from negotiating with other capital providers, effectively limited the Debtor to either completing an Option financing transaction with LaSalle or not completing a transaction at all. (Tr. of Oral Argument March 26, 1999 at 7, 12, 15).

## DISCUSSION

For purposes of this motion, it is assumed that the Debtor breached the exclusivity provision by negotiating with other entities. The issue is whether, assuming the Debtor's breach, LaSalle's damages should be limited to the amount that it expended in reliance on the Debtor's promise of exclusive negotiations or whether LaSalle is entitled to the benefit of the deal that it hoped to enter into with the Debtor. The parties cite both Illinois and New York contract cases, and each party argues that the law of both states supports its position.

The primary New York case cited by the parties is *Goodstein Construction Corp. v. City of New York*, 80 N.Y.2d 366, 590 N.Y.S.2d 425, 604 N.E.2d 1356 (1992). In *Goodstein*, the New York Court of Appeals held that on the facts presented, expectation damages were not available to a party injured by a breach of a contract to bargain exclusively because the injured party was not entitled to the benefit of a bargain that was not reached. *Id.* at 373–74, 590 N.Y.S.2d 425, 604 N.E.2d 1356. The court reasoned that if no agreement has been reached, it cannot be known what agreement would have been reached, and there is no way to measure lost expectation. *Id.* The court held in the alternative that lost profits damages could not have been reasonably contemplated because the letter agreement under which the plaintiff made its claim was terminable by the City and, even if a final agreement had been reached, it would have been subject to various layers of government approval before it could become binding. *Id.* at 374, 590 N.Y.S.2d 425, 604 N.E.2d 1356.

The principal Illinois case cited by the parties is *Venture Associates Corp. v. Zenith Data Systems Corp.*, 96 F.3d 275 (7th Cir.1996). In *Venture*, the Seventh Circuit summarized as follows the relevant Illinois law in a suit for breach of an agreement to negotiate in good faith for the sale of a business:

Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the

parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages—the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages.

*Venture*, 96 F.3d at 278.

While this opinion does not foreclose the availability of expectancy damages in every case where an agreement of exclusive bargaining is breached, it forecloses such damages on the specific facts of the case at bar. The evidence proffered by the parties shows that the Debtor had two legitimate alternatives under its agreement with LaSalle: either to do a deal with LaSalle (and thereby avoid imminent bankruptcy) or to do no deal at all. It took the latter alternative and then filed a Chapter 11 petition. Thus, the Debtor never entered into a transaction of the sort that it and LaSalle contemplated, namely, a transaction that would enable it to exercise timely the NatWest Option without resort to a reorganization in bankruptcy court. Since the Debtor never entered into the contemplated purchase agreement with anyone, LaSalle cannot prove that, had it not been for the Debtor's breach of the exclusivity provision, it would have entered into a purchase agreement with La-Salle.

LaSalle's proof logically would rest on a factual finding that the Debtor had no choice but to complete a transaction with someone, and therefore, but for the Debt-

or's breach, it would have completed a transaction with LaSalle. LaSalle makes this factual contention, but does not adequately support it with evidence. (LaSalle Mem. at 28). LaSalle's proffered evidence on this summary judgment motion consists of a statement made by the Debtor's agent during negotiations for the deal that "Not closing is not an option." (Rubin Aff. Ex. N). On the facts of this case, this statement cannot be relied on for the truth of the matter asserted because it was mere rhetoric, the truth of which was later belied by the Debtor's failure to close. La-Salle also asserts that the Debtor has conceded the factual point that, but for the Debtor's breach, the parties would have made a final deal. LaSalle maintains that, "It is undisputed that [the Debtor] needed to complete a transaction for the recapitalization of [the Debtor] prior to the date the NatWest Option expired, April 14, 1995. [The Debtor] does not contest this point, nor could it because of the allegations contained in its Counterclaim that it '. . . faced foreclosure and loss of its assets to NatWest if the [NatWest Option] was not exercised timely.'" (LaSalle Mem. at 28). It is true that the Debtor's 56.1 Statement is inadequate in this respect, since it does not clarify that not only did the Debtor not close a deal with LaSalle, but also, that the Debtor did not consummate a transaction with one of LaSalle's competitors. However, the Memorandum Opinion and Order of the United States District Court for the Northern District of Illinois, dated September 28, 1995, which describes the relevant facts in this case, clearly shows that the Debtor did not, in fact, complete a transaction to finance the Option on or before its expiration date. (Kaiser Aff. Ex. C at 1–4). Moreover, LaSalle does not deny that the Debtor filed for bankruptcy protection on April 14, 1995 due to its failure to obtain financing for the Option before its expiration date. LaSalle cannot show that the Debtor had no choice but to complete a transaction with someone (and therefore, but for the Debtor's breach, it would have completed a transaction with

LaSalle). A deal to finance the exercise of the NatWest Option never closed. Accordingly, LaSalle cannot show that this is an appropriate case for lost profits damages.

## CONCLUSION

For the foregoing reasons, the Debtor's motion is granted.

SO ORDERED.