# IN THE SUPREME COURT OF TEXAS

No. 18-0059

DALLAS/FORT WORTH INTERNATIONAL AIRPORT BOARD, PETITIONER,

v.

VIZANT TECHNOLOGIES, LLC RESPONDENT

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FIFTH DISTRICT OF TEXAS

**Argued January 22, 2019**

JUSTICE BOYD delivered the opinion of the Court.

The plaintiff in this case claims that a governmental entity breached a contractual promise to make a good-faith effort to obtain authorization for a higher payment than the parties' written contract required the entity to make. We must decide whether governmental immunity applies and, if so, whether chapter 271 of the Texas Local Government Code waives that immunity. We conclude that governmental immunity applies and chapter 271 does not waive the entity's immunity. We reverse the court of appeals' judgment in part and render judgment dismissing all of the plaintiff's claims.

## I.
## Background

The Dallas-Fort Worth International Airport Board operates the DFW International Airport. *See* TEX. TRANSP. CODE. §§ 22.074(c), (d). In 2012, the Board's staff retained Vizant

Technologies[1] to analyze the airport's payment-processing costs (including costs for processing credit-card payments) and to provide recommendations on how the airport could reduce those costs. Exercising delegated authority, the Board's staff negotiated and executed a written Consulting Agreement providing for a three-year term. The contract required the Board to pay Vizant a consulting fee to be calculated as (1) fifty percent of any refunds the airport received from its payment-processing vendors as a result of Vizant's recommendations, plus (2) a specified percentage[2] of the amount by which Vizant's recommendations reduced the Board's historical payment-processing costs.

"Notwithstanding" these provisions, the contract stated that Vizant's "compensation under this Agreement shall not exceed $50,000," and Vizant must "stop work once its compensation reaches" that amount.[3] But it further provided that "[i]n the event" Vizant's fee exceeds $50,000, the Board "will make a good faith effort to receive board authorization to increase the compensation," and "if approved," the parties would amend the contract to reflect the higher amount. Vizant alleges that it agreed to the $50,000 cap only because the Board's staff assured Vizant that the Board always approves such increases.

According to Vizant, its services ultimately saved the airport about $820,000, and its fee under the agreed formula exceeded $300,000. Vizant submitted an invoice for $50,000 and

---

[1] Vizant is actually the successor to the original contractor, P.E. Systems, LLC.

[2] The contract specified that the Board would pay Vizant 45% of its cost reductions in the first year of the contract, 40% in the second year, and 35% in the third year.

[3] Apparently, the Board imposed this cap pursuant to a competitive-bidding statute, *see* TEX. LOC. GOV'T CODE § 252.021(a) (requiring certain procedures for "an expenditure of more than $50,000 from one or more municipal funds"), and a Board policy generally authorizing its staff to approve expenditures up to $50,000 without Board approval.

requested that the Board approve an amendment authorizing the higher amount. The Board's staff paid the $50,000 and ultimately asked to Board to approve an increase to $330,000, but the Board denied that request. Vizant sued the Board for breach of contract, fraud, fraudulent inducement, and promissory estoppel, alleging in part that the Board failed to make the promised good-faith effort to authorize the increased compensation.[4]

The Board filed a plea to the jurisdiction asserting that governmental immunity bars Vizant's claims. The trial court denied the plea, holding that governmental immunity does not apply because the Board's management of the airport's payment-processing costs is a proprietary (rather than governmental) function. *See Wasson Interests v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018) ("*Wasson II*") ("The governmental/proprietary dichotomy recognizes that immunity protects a governmental unit from suits based on its performance of a governmental function but not a proprietary function.").

The Board filed an interlocutory appeal from the trial court's denial of its jurisdictional plea.[5] The court of appeals reversed in part and affirmed in part. *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs.*, LLC, 565 S.W.3d 69, 71 (Tex. App.—Dallas 2017). It reversed and rendered judgment dismissing Vizant's fraud and estoppel claims, concluding that governmental immunity applies because the Board was engaged in a governmental function and no statute waives the Board's immunity against those claims. *Id.* at 74–75. But it affirmed the trial court's denial of the

---

[4] Vizant argues that its evidence established that the Board's staff improperly tried to avoid having to pay the increased amount, discussed wrongfully terminating the agreement, and unjustifiably delayed seeking the Board's approval, and that the Board summarily rejected the increase without any discussion and "never intended to abide by the payment term." The trial court did not reach, and we need not address, whether the Board in fact failed to make a good-faith effort to authorize the increase.

[5] *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal from trial court order granting or denying a governmental unit's plea to the jurisdiction).

3

Board's plea against Vizant's breach-of-contract claim, holding that—although governmental immunity applies—chapter 271 of the Texas Local Government Code waives the Board's immunity against that claim. *Id*. at 75.[6] The Board filed a petition for review challenging the court of appeals' holding on the contract claim, which we granted.[7]

## II.
## Governmental Immunity

We first address whether governmental immunity applies to Vizant's breach-of-contract claim. Governmental immunity generally protects local governmental entities against both lawsuits and legal liabilities. *City of Houston v. Hous. Mun. Emps. Pension Sys.*, 549 S.W.3d 566, 575 (Tex. 2018). Vizant does not dispute that the Board qualifies as a local governmental entity,[8] but argues that immunity does not apply here because the Board was acting in a proprietary capacity when it entered into the contract. The trial court agreed with Vizant, but the court of appeals disagreed and held that the Board was acting in a governmental capacity. We agree with the court of appeals.[9]

---

[6] The Board's jurisdictional plea asserted immunity only against Vizant's fraud and promissory-estoppel claims. In response to the breach-of-contract claim, the Board sought summary judgment on the ground that Vizant could show no contractual right to any payment above $50,000. The trial court never ruled on that motion, but the Board argued on appeal that immunity bars the contract claim as well as the fraud and estoppel claims. Because immunity from suit implicates the court's jurisdiction, the court of appeals permitted the Board to raise that issue for the first time on appeal. 565 S.W.3d at 72 n.2; *see Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94–95 (Tex. 2012). Vizant does not complain about that ruling here.

[7] Vizant did not file a petition for review and does not challenge the court of appeals' holding that immunity bars the fraud and estoppel claims.

[8] *See* TEX. TRANSP. CODE §§ 22.072, .074 (providing for local governments and other public agencies to jointly own airport property, facilities, and privileges and to act jointly through a joint board having exclusive power to maintain and operate the airport); *see also Dall./Fort Worth Int'l Airport Bd. v. Ass'n of Taxicab Operators, USA*, 427 S.W.3d 547, 548 (Tex. App.—Dallas 2014, pet. denied) (describing the Board as "a special purpose governmental entity separate from each of the cities" that created it).

[9] The Board argues that Vizant waived any challenge to the court of appeals' holding that the Board was acting in a governmental capacity because Vizant failed to file a cross-petition seeking our review. *See* TEX. R. APP.

4

Because immunity is inherent in the state's sovereignty, certain local governmental entities enjoy its protection only when they act "as a branch" of the state and not when they act "in a proprietary, non-governmental capacity." *Wasson II*, 559 S.W.3d at 146 (quoting *Wasson Interests v. City of Jacksonville*, 489 S.W.3d 427, 430 (Tex. 2016) ("*Wasson I*")). As we recognized in *Wasson II*, deciding whether an entity enters a contract as a governmental or proprietary function can be quite difficult. *Id.* at 147. But here, it is not. Pursuant to its constitutional authority,[10] the legislature has enumerated particular functions as governmental or proprietary for purposes of determining whether immunity applies to tort claims, *see* TEX. CIV. PRAC. & REM. CODE § 101.0215(a), and these designations "aid our inquiry" in cases involving contract claims as well. *Wasson II*, 559 S.W.3d at 148 (quoting *Wasson I*, 489 S.W.3d at 439).

Regarding the Board's functions, the legislature has unambiguously declared that the "maintenance, operation, [and] regulation" of an airport and the "exercise of any other power granted" for that purpose, whether exercised "severally or jointly" by local governments, "are public and governmental functions, exercised for a public purpose, and matters of public

---

P. 53.1 ("A party who seeks to alter the court of appeals' judgment must file a petition for review."); *see also First Bank v. Brumitt*, 519 S.W.3d 95, 112 (Tex. 2017) (discussing rule 53.1). But Vizant does not seek to alter the court of appeals' judgment here. The trial court refused to dismiss any of Vizant's claims because it believed the Board was acting in a proprietary capacity. The court of appeals disagreed, but its *judgment* merely reverses the trial court's judgment for the Board on the fraud and estoppel claims and otherwise affirms, without declaring that the Board was acting in a governmental capacity or otherwise addressing that issue. Vizant does not challenge the court of appeals' judgment on the fraud and estoppel claims, nor (of course) does it seek to alter the judgment affirming the trial court's refusal to dismiss its contract claim. Instead, it raises the proprietary-function argument as an alternative basis to support that judgment. Under such circumstances, rule 53.1 did not require Vizant to file a petition for review. *See Ineos USA, LLC v. Elmgren*, 505 S.W.3d 555, 567 n.4 (Tex. 2016) (holding that rule 53.1 did not require plaintiffs to file a petition for review when they merely raised alternative arguments and did not seek to alter the court of appeals' judgment reversing the trial court's summary judgment dismissing their claims).

[10] As we explained in *Wasson II*, the Texas Constitution authorizes the legislature to "define for all purposes those functions of a municipality that are to be considered governmental and those that are proprietary, including reclassifying a function's classification assigned under prior statute or common law." 559 S.W.3d at 147 (quoting TEX. CONST. art. XI, § 13).

5

necessity." TEX. TRANSP. CODE § 22.002(a); *see also* TEX. CIV. PRAC. & REM. CODE § 101.0215(a)(10) (listing "airports" as a governmental function under the Tort Claims Act). Because the Board entered into the contract with Vizant for the purpose of analyzing and reducing the airport's expenses, it was acting in its governmental capacity and governmental immunity applies.

## III.
## Waiver of Immunity

We next address whether the legislature has waived the Board's immunity against Vizant's contract claim. A governmental entity waives its immunity *from liability* by entering into a contract, voluntarily binding itself like any other party to the agreement. *Tooke v. City of Mexia*, 197 S.W.3d 325, 332 (Tex. 2006). But only the legislature can waive governmental immunity *from suit*, and when it chooses to waive such immunity it must express that intent using "clear and unambiguous" language. *Lubbock Cty. Water Control & Imp. Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 301 (Tex. 2014). Unless waived, immunity from suit deprives trial courts of jurisdiction over suits against the government. *State v. Lueck*, 290 S.W.3d 876, 880 (Tex. 2009).

### A. Chapter 271

Vizant argues, and the court of appeals agreed, that chapter 271 of the Local Government Code waives the Board's immunity against Vizant's contract claim. Chapter 271 provides that a

> local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

TEX. LOC. GOV'T CODE § 271.152.

6

A "contract subject to this subchapter" is "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity." *Id.* § 271.151(2)(A). The subchapter's "terms and conditions" include section 271.153, which limits "the total amount of money awarded in an adjudication brought against a local governmental entity for breach of a contract subject to this subchapter" to

> (1)    the balance due and owed by the local governmental entity under the contract as it may have been amended, including any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration;
>
> (2)    the amount owed for change orders or additional work the contractor is directed to perform by a local governmental entity in connection with the contract;
>
> (3)    reasonable and necessary attorney's fees that are equitable and just; and
>
> (4)    interest as allowed by law, including interest as calculated under Chapter 2251, Government Code.

*Id.* § 271.153(a).[11] Under subsection (b), the damages awarded may *not* include

> (1)    consequential damages, except as expressly allowed under Subsection (a)(1);
>
> (2)    exemplary damages; or

---

[11] We recently held that "the balanced due and owed by the local governmental entity under the contract," *see* TEX. LOC. GOV'T CODE § 271.153(a)(1), is "simply the amount of damages for breach of contract payable and unpaid," even if the amount is not "stated in," "expressly provided for in," or even "ascertainable from" the contract. *Zachry Constr. Corp. v. Port of Hous. Auth. of Harris Cty.*, 449 S.W.3d 98, 111–12, 114 (Tex. 2014)). In response to the Board's argument that the amount Vizant seeks is not due and owed under the contract, the court of appeals held that whether the amount sought is due and owed under the contract does not affect whether the contract is a "properly executed contract" for which immunity is waived, but instead is merely "a criterion for determining the amount awarded *after* adjudicating a breach of contract claim." 565 S.W.3d at 74 (emphasis added). We expressly held in *Zachry*, however, that section 271.153 and the other "terms and conditions" to which section 271.152 refers "define the scope of [chapter 271's] waiver of immunity," so that the chapter "does not waive immunity from suit on a claim for damages not recoverable under Section 271.153." *Zachry*, 449 S.W.3d at 108, 110. To the extent that the court of appeals held that section 271.153 limits the damages available but not the scope of the immunity waiver, it erred. But because we conclude that the contract does not state "the essential terms of the agreement" Vizant seeks to enforce and is thus not a "contract subject to this subchapter," we need not address whether the amount Vizant seeks is "due and owed under the contract."

7

(3) damages for unabsorbed home office overhead.

*Id.* § 271.153(b). In summary, the statute waives a local governmental entity's immunity from suit only for claims alleging breach of a contract "subject to this subchapter" and seeking relief listed in section 271.153(a), but not for claims seeking relief listed in section 271.153(b). *Zachry*, 449 S.W.3d at 111.

## B. "A contract subject to this subchapter"

To be "subject to this subchapter," the contract at issue must (1) be in writing, (2) state the agreement's essential terms, (3) require the contractor to provide goods or services to the governmental entity, and (4) be properly executed on the entity's behalf. *Id.* § 271.151(2); *see City of Denton v. Rushing*, — S.W.3d —, No. 17-0336, 2019 WL 1212188, at *2 (Tex. Mar. 15, 2019). We focus here on the second requirement, considering whether this contract contains the "essential terms" to support Vizant's claim. An agreement's essential terms are those that parties would reasonably regard as "vitally important ingredient[s]" of their bargain. *Fischer v. CTMI L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). Whether particular terms are essential generally depends on the specific contract at issue. *Id.* A contract must state its essential terms with "a reasonable degree of certainty and definiteness," sufficient to confirm that both parties actually intended to be contractually bound and to enable a court to understand and enforce the parties' obligation and provide an appropriate remedy when breached. *Id.*

As the remedy for the Board's alleged breach of contract, Vizant seeks an order requiring the Board to pay Vizant $330,000, based on the application of the consulting-fee formula to the amount by which Vizant's recommendations reduced the airport's payment-processing costs. Vizant does not allege, however, that the Board ever agreed to pay that amount. To the contrary,

8

Vizant acknowledges that the contract expressly caps the amount the Board must pay at the $50,000 the Board has already paid. Vizant alleges, however, that the Board owes Vizant more than it agreed to pay because the Board breached its promise to "make a good faith effort to receive board authorization to increase" the agreed amount. So we must decide whether the good-faith-effort clause states the "essential terms" of the agreement Vizant seeks to enforce.[12]

We have previously recognized in other contexts that good-faith conduct commonly "refers to conduct which is honest in fact [and] free of improper motive or wilful ignorance of the facts at hand." *Associated Indemnity*, 964 S.W.2d at 285 (addressing contractual good-faith standard governing surety's settlement of claims); *see also R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.*, 482 S.W.3d 559, 567 (Tex. 2016) (addressing statutory defense for acts performed "in a good-faith effort"); *see also* TEX. BUS. & COM. CODE § 1.201(20) (defining good faith under the Uniform Commercial Code to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing"). But a contractual duty to act in good faith[13] does not create a new

---

[12] We have not previously addressed the multitude of thorny issues surrounding contractual "effort" clauses. *See generally* Zachary Miller, *Best Efforts?: Differing Judicial Interpretations of a Familiar Term*, 48 ARIZ. L. REV. 615, 615 (2006) ("The judicial landscape is littered with conflicting interpretations of efforts clauses."); *see also Citizens First Nat'l Bank of Tyler v. Cinco Expl. Co.*, 540 S.W.2d 292, 297 (Tex. 1976) (noting only that the phrase "best efforts" is "certainly susceptible to a variety of interpretations"). Many courts and commentators have addressed issues involving a party's promise to make "best efforts." *See generally* Rob Park, *Putting the "Best" in Best Efforts*, 73 U. CHI. L. REV. 705, 705 (2006) ("Today, the law of best efforts obligations is deeply unsettled, badly in need of clarity."); *see also Daimler Chrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 170–177 (Tex. App.—Fort Worth 2012, no pet.) (discussing enforceability of, and standards for enforcing, "best efforts" and "good faith" clauses). And some have recognized a distinction between "best efforts" and a "good-faith effort." *See, e.g.*, Miller, *supra*, at 618 ("[T]he best efforts standard should be more 'onerous' and 'exacting' than the standard of good faith.") (internal footnotes omitted); E. Allan Farnsworth, *On Trying to Keep One's Promises: The Duty of Best Efforts in Contract Law*, 46 U. PITT. L. REV. 1, 8 (1984) ("The two standards are distinct and that of best efforts is the more exacting."). We are concerned here only with the Board's contractual promise to make a "good-faith effort" to obtain the Board's authorization of a higher payment amount.

[13] Most states impose an implied duty of good faith and fair dealing into every private contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). Under Texas law, however, contracting parties owe a good-faith duty only if they expressly agree to act in good faith, a statute imposes the duty, or the parties have a "special

9

obligation or independent cause of action; instead, it merely governs the conduct by which the party must fulfill the contractual obligation to which it applies. *N. Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606–07 (Tex. 1998); *see John Wood Grp. USA, Inc. v. ICO, Inc.*, 26 S.W.3d 12, 22 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (holding that a contractual good-faith clause "does not create any new obligations").

## C. "Essential elements" of a legally enforceable agreement

In considering whether the Board's promise to make a good-faith effort to authorize a higher payment states the essential terms of an enforceable agreement, we are faced first with the obvious awkwardness of the contract's language. Read literally, the Board promised to make a good-faith effort to obtain *its own* authorization for the higher payments.[14] As the parties agree, however, the Board's staff negotiated and executed the contract on the Board's behalf, with the Board's authority but without the Board's express approval. Under these circumstances, it might be more reasonable to construe the clause as a promise by the Board's *staff* to make a good-faith effort to obtain *the Board's* authorization for any higher payment. And as both parties agree, the staff had no authority to contractually obligate the Board to pay anything more than $50,000. To the extent *the staff* agreed to make a good-faith effort, that promise is not enforceable against *the*

---

relationship" like that between an insurer and insured. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 225 (Tex. 2002); *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 280 (Tex. 1998).

[14] The Board notes that the contract actually states that the "Client" would make a good-faith effort to obtain board authorization, and its introductory paragraph identifies the "Client" as "DFW International Airport," not as the DFW International Airport *Board*. The contract's signature page, however, identifies the "Client" as the "DFW International Airport Board," with the word "Board" apparently added to the printed document in a typewriter font, as if to correct that word's omission on the signature page. In light of the fact that the Board's vice-presented executed the contract on behalf of the "Board" as the "Client," and because both parties agree that the "Airport" is not a legal entity, we conclude that the contract sufficiently identifies the Board as the Client.

*Board*—and even if it were, the remedy could never be to require the Board to pay more than it authorized to staff to negotiate.

But even if we construe the clause as written, to require *the Board* to make a good-faith effort to obtain its own authorization, Vizant fares no better. Under that construction, the Board agreed to make a good-faith effort to authorize or approve or agree to make a higher payment in the future. Importantly, the Board did not agree to authorize or agree to make a higher payment; instead, it agreed to make a *good-faith effort* to agree to a higher payment. The issue is not whether the Board made an enforceable "agreement to agree," but whether it made an enforceable agreement to make a good-faith effort to agree. We thus reject the Board's argument that the good-faith-effort clause is nothing more than an unenforceable agreement to agree.[15]

Breaking down the clause, the Board merely promised to *make an effort* to agree to the higher payment, but to do so in good faith. In this sense, its promise was the equivalent of a promise to negotiate towards a future bargain in good faith. Some jurisdictions and commentators have suggested that such a promise can be legally enforceable. *See, e.g.*, *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 96 F.3d 275, 278 (7th Cir. 1996) (Posner, C.J.) ("The notion of a legally enforceable duty to negotiate in good faith toward the formation of a contract rests on somewhat shaky foundations, though some contracts do create such a duty."); *Schmidt v. Campanella Sand*

---

[15] We would face different issues if the contract had not included the good-faith-effort language and instead had simply provided that the Board agreed to agree to make a higher payment if Vizant's recommendations produced savings that generated fees greater than $50,000. That "agreement to agree" might be enforceable because the contract provides a clear formula to determine the amount of the higher payment and contains all of the terms necessary for a court to enforce it by applying that formula. *See Fischer*, 479 S.W.3d at 241, 244. But because the record establishes that the Board's staff was only authorized to bind the Board to contracts providing for payments up to $50,000, we would then have to decide whether the staff had the authority to bind the Board to an agreement to agree to pay a higher amount. But we need not resolve either of those issues because this contract did not include an agreement to agree to make a higher payment; instead, it included an agreement to *make a good-faith effort* to agree to a higher payment.

11

*& Gravel Co.*, No. 00 C 6123, 2001 WL 881323, at *3 (N.D. Ill. Aug. 6, 2001) ("Promises to negotiate in good faith are enforceable, regardless of whether the negotiations would lead to a new contract."), *aff'd*, 49 F. App'x 647 (7th Cir. 2002); E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 COLUM. L. REV. 217, 236 (1987) ("A negotiating party may not with impunity break a promise made during negotiations if the other party has relied on it.") [hereinafter *Precontractual Liability*].

We have held, however, that agreements to negotiate toward a future contract are not legally enforceable. *See Fisher*, 479 S.W.3d at 242 ("To be sure, contracting parties' 'agreement to enter into negotiations, and agree upon the terms of a contract, if they can, cannot be made the basis of a cause of action.'") (quoting *Radford v. McNeny*, 104 S.W.2d 472, 474 (Tex. 1937)). And Texas courts of appeals have held that this is true even if the party agreed to negotiate in good faith. *See, e.g.*, *Barrand, Inc. v. Whataburger, Inc.*, 214 S.W.3d 122, 139 (Tex. App.—Corpus Christi–Edinburg 2006, pet. denied) ("Regardless of whether a duty of good faith and fair dealing arose under the parties' agreement, Whataburger is not obligated to execute new contracts with Barrand."); *John Wood Group*, 26 S.W.3d at 21 ("By contrast, under Texas law, an agreement to negotiate in the future is unenforceable, even if the agreement calls for a 'good faith effort' in the negotiations."); *Maranatha Temple, Inc. v. Enter. Prods. Co.*, 893 S.W.2d 92, 104 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("The fact that this particular agreement to negotiate in the future includes a term calling for the appellees to put forth a 'good faith effort' in the negotiations does not remove the agreement from this rule. The agreement, whatever its specific language, is still an agreement to enter into future negotiations, and, as such, it is unenforceable."). Consistent with our precedent, we hold that the contract here does not state the essential terms of a legally

12

enforceable agreement requiring the Board to make a good-faith effort to authorize a higher payment to Vizant. As a result, the agreement Vizant seeks to enforce is not a "contract subject to this subchapter" under section 271.151(2), and chapter 271 does not waive the Board's immunity.

**D. "Consequential damages"**

In reaching this result, we acknowledge that "many more jurisdictions have recognized the enforceability of contracts to negotiate than have repudiated that doctrine [and] the trend line appears to be moving steadily in favor of recognizing a cause of action for breach of a contract to negotiate." *Butler v. Balolia*, 736 F.3d 609, 614 (1st Cir. 2013) (listing cases). Perhaps a case may yet come before this Court that convinces us to overrule our precedent and join the trending majority of jurisdictions. But we need not consider such a drastic step in this case because chapter 271 would not waive the Board's immunity even if we found the Board's promise to be legally enforceable.

Assuming both that the contract states the essential terms of a legally enforceable promise to make a good-faith effort and that the Board breached that promise as Vizant alleges, we would still need to determine the proper remedy for that breach. Because the Board would have breached an "efforts" agreement, and not merely an agreement to agree to make a higher payment, the proper remedy would not necessarily include an order requiring the Board to pay the $330,000 Vizant seeks.

In this sense, the distinction between the Board's promise to make a good-faith effort to authorize a higher payment and a more general promise to make a good-faith effort to "negotiate" a future bargain becomes more important. In the agreement-to-negotiate context, courts must not overlook "the difference between an agreement to negotiate a contract and the contract to be

13

thrashed out in those negotiations. The agreement to negotiate does not contain the terms of the final agreement. Otherwise it would *be* the final agreement." *Venture Associates*, 96 F.3d at 279 (emphasis in original); *see L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) ("These agreements [to negotiate] do not commit the parties to reach their ultimate contractual objective; instead, such agreements create an 'obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.'") (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)).

But here, the parties had already negotiated and agreed upon the formula that would provide the terms of the potential future agreement: *if* the Board authorized the higher payment, it would pay Vizant a specific percentage of the amount the airport saved as a result of Vizant's recommendations. The only contingency was whether the Board would in fact authorize the higher payment.

The issue thus becomes whether Vizant could recover damages for the Board's breach of its promise to make a good-faith effort and, if so, the proper measure of those damages. Most courts that have considered this issue have permitted a damages award, but "courts and scholars have quibbled about the appropriate measure of damages when a contract to negotiate has been breached." *Butler*, 736 F.3d at 615. Some courts and commentators would allow only reliance damages (the amount the plaintiff expended in reliance on its belief that the defendant was negotiating in good faith),[16] while others have allowed expectancy damages (the amount the

---

[16] *See*, *e.g.*, *Precontractual Liability* at 267 ("[T]he appropriate remedy is not damages for the injured party's lost expectation under the prospective ultimate agreement but damages caused by the injured party's reliance on the agreement to negotiate."). Professor Farnsworth explained that the remedy should be limited to reliance damages because "there is no way of knowing what the terms of the ultimate agreement would have been, or even whether the parties would have arrived at an ultimate agreement, so there is no possibility of a claim for lost expectation under such an agreement." *Id.* at 263. Thus, no claim for breach of an agreement to negotiate in good faith

14

plaintiff expected to receive as a result of the anticipated contract). *Butler*, 736 F.3d at 616. In an

oft-quoted passage, Chief Judge Posner observed that the appropriate measure must depend on

whether the plaintiff can prove that the parties would have entered into a particular agreement if

the defendant had acted in good faith:

> Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages—the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages.

*Venture Associates*, 96 F.3d at 278.

We need not join this debate or resolve these issues here, however, because as Chief Judge

Posner noted, either measure of damages constitutes *consequential* damages incurred as a result of

the defendant's failure to act in good faith, not as a result of the defendant's failure to perform

under the anticipated contract. A contractual breach may give rise to either "direct" or

"consequential" damages. *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816

---

> will support recovery measured in the most generous way, by the expectation interest. An award based on that interest would give the injured party the "benefit of the bargain" that was not reached. But if no agreement was reached, and—in contrast to the situation in which an offer has been made—it cannot even be known what agreement would have been reached, there is no way to measure lost expectation. Aside from this clear restriction, however, uncertainty prevails.

*Id.* at 223; *see also L–7 Designs*, 647 F.3d at 431 ("Although lost profits are not available where no agreement is reached, . . . out-of-pocket costs incurred in the course of good faith partial performance are appropriate.") (internal citations omitted).

(Tex. 1997). Direct damages are damages a defendant is "conclusively presumed" to have foreseen as a result of its breach because they "are the *necessary* and usual result of," and "flow naturally and *necessarily* from," that wrongful act. *Id.* (emphases added). By contrast, consequential damages "result naturally, but not necessarily," from the defendant's breach, and are not "the usual result of the wrong." *Id.*

Here, Vizant seeks to recover damages totaling $330,000, representing the amount it contends the Board would have agreed to pay had it made a good-faith effort to authorize a higher payment. But the Board's failure to pay any or all of that amount is not a "necessary" or "usual" result of its alleged failure to make a good-faith effort. Even if the Board had made a good-faith effort to authorize a higher payment, it could have refused to approve the higher amount for any number of reasons, and Vizant would have had no contractual right to demand any additional payment at all. We thus agree with Chief Judge Posner that, even if Vizant could recover expectancy damages, those damages would be consequential damages incurred as a result of the Board's failure to make a good-faith effort, not direct damages incurred as a result of its failure to pay an amount it had agreed to agree to pay.

As we have noted, subsection (b) of section 271.153 expressly provides that the damages awardable on a contract claim for which chapter 271 waives governmental immunity cannot include "consequential damages, except as expressly allowed under Subsection (a)(1)." TEX. LOC. GOV'T CODE § 271.153. Subsection (a)(1) expressly includes certain consequential damages within its reference to the balance due and owed: "any amount owed as compensation for the increased cost to perform the work as a direct result of owner-caused delays or acceleration." *Id.* § 271.153(a)(1). As we explained in *Zachry*, "Read together, Subsections (a)(1) and (b) allow

16

recovery of contract damages, including delay damages, but excluding other consequential damages." *Zachry*, 449 S.W.3d at 112. So even if the contract here stated the essential terms of a legally enforceable promise to make a good-faith effort, chapter 271 does not "clearly and unambiguously" waive the Board's immunity because any amounts Vizant could possibly recover for breach of that promise constitute consequential damages other than delay damages.

## IV.
## Conclusion

Because Vizant does not challenge the court of appeals' dismissal of its fraud and promissory-estoppel claims, we affirm that part of the court of appeals' judgment. We reverse the part of the court of appeals' judgment affirming the trial court's denial of the Board's jurisdictional plea against Vizant's breach-of-contract claim. Because governmental immunity bars all of Vizant's claims against the Board and chapter 271 does not waive that immunity, we render judgment dismissing all claims.

_____
Jeffrey S. Boyd
Justice

Opinion delivered: May 17, 2019