# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 24, 2022

Lyle W. Cayce
Clerk

No. 21-20396

SCD BLK 251 Houston LLC,

*Plaintiff—Appellant*,

*versus*

Mt. Jefferson Holdings L.L.C.,

*Defendant—Appellee*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:20-CV-3463

Before King, Elrod, and Southwick, *Circuit Judges*.
Per Curiam:[*]

SCD BLK 251 Houston appeals from the district court's grant of judgment on the pleadings for Mt. Jefferson Holdings. The district court assumed *arguendo* that an option contract existed to build a connection between a future building on a lot owned by SCD BLK 251 and a hotel owned by Mt. Jefferson Holdings, but found that SCD BLK 251 was not ready to

---

[*] Pursuant to 5th Circuit Rule 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.4.

No. 21-20396

perform its end of the bargain (constructing the connection) within a reasonable time of the end date specified in the agreement. We, however, find that the agreement at issue was not a binding contract and therefore AFFIRM on that ground.

## I.

The facts of this case begin in 2000, when Crescent Real Estate Funding ("Crescent"), the predecessor-in-interest to SCD BLK 251, sold the Four Seasons Hotel in Houston (the "Hotel") to HEF Houston LP ("HEF"), the predecessor-in-interest to Mt. Jefferson Holdings. As part of that agreement, HEF granted Crescent "the future right and option to connect a skybridge or tunnel to the Hotel" through a document referred to as the "Agreement Regarding Span" (the "Span Agreement"). The language of that agreement is as follows:

> Connection Right. HEF hereby grants and conveys to Crescent and the successors and assigns in ownership (each, a "Block 251 Owner") of Block 251 S.S.B.B., Houston, Texas ("Block 251"), the future right to connect an air bridge or tunnel (a "Connection") to a point on the wall of the Improvements, provided (a) such right shall be limited to a Connection located on or below the third floor of the Improvements that is mutually agreed upon by the owner of the Property ("Property Owner") and Block 251 Owner, and (b) the Connection shall not, without the consent of Property Owner, interfere with the current configuration of the Hotel (for example, the Connection will not be permitted to attach at the location of the restaurant(s) or banquet rooms of the Hotel without the consent of Property Owner). Block 251 Owner and Property Owner may each use such Connection for access to and from the Improvements to "Class A" improvements to be constructed on Block 251, if any, pursuant to an agreement which shall generally be in the form of the existing span

No. 21-20396

agreements affecting the Property, except as otherwise provided herein. The form of such agreement shall incorporate provisions requiring the consent of Property Owner to the exact location of the Connection, the design of the Connection, the method of construction of the Connection, insurance coverage during and after the construction of the Connection and the timing of construction of the Connection. Property Owner agrees that it will not unreasonably withhold, condition or delay its consent to the construction of the Connection; however, it shall be reasonable for Property Owner to withhold its consent in the event Property Owner determines, using its reasonable discretion, that such a tunnel or air bridge, once constructed and fully functional, would adversely affect the operations of the Hotel, other than the imposition of increased operating costs resulting from the operation of the tunnel or air bridge. All costs of constructing the Connection shall be paid by Block 251 Owner, provided that fees and expenses incurred by Property Owner in negotiating and reviewing the plans for the Connection (including without limitation, legal, architectural and engineering fees) shall be paid by Property Owner. Block 251 Owner and Property Owner shall share equally all costs thereafter incurred in the operation and maintenance of the Connection, but Block 251 Owner shall be solely responsible for all capital expenditures required for the upkeep of the Connection, except for the exterior doors from the Connection to the Hotel. The execution of a span agreement between Property Owner and the Block 251 Owner shall supersede and cancel the retained rights set forth in this Agreement.

The agreement stated that the right "shall run with the land and shall inure to the benefit of and be binding upon the heirs, personal representatives, successors and assigns in ownership of the Property [i.e., the Hotel] and Block 251 respectively." The agreement additionally included a

3

clause that "[t]he right granted above shall be exercised, if at all, on or before December 31, 2020," and that "[t]ime is of the essence in the performance of all obligations under the Agreement." Along with executing the agreement, Crescent and HEF executed a "Recorded Memorandum of Span Agreement" that was filed with the Harris County Clerk's office.

After purchasing Block 251 in 2019, SCD BLK 251 ("SCD") began discussions with Mt. Jefferson Holdings ("Mt. Jefferson") (which had previously purchased the Hotel) regarding the details of the connection described in the Span Agreement and the possibility of entering into the secondary agreement contemplated therein. On April 8, 2020, SCD sent Mt. Jefferson a letter stating that "SCD has elected to exercise the right to connect given to SCD under the Span Agreement."

After further negotiations following this letter were unsuccessful, SCD sued Mt. Jefferson in state court, seeking "a judicial declaration that SCD exercised its right and option to connect a sky bridge from Block 251 to the [Hotel] by providing written notice that it exercised such right prior to December 31, 2020 [the expiration date included in the Span Agreement]." It is undisputed that, as of the filing of the lawsuit, no building existed on Block 251, which was instead an empty lot being used for parking.

After the lawsuit was filed, Mt. Jefferson filed a general denial of SCD's allegations and removed the case to federal court. The parties filed cross-motions for judgment on the pleadings. The district court granted judgment on the pleadings for Mt. Jefferson. It assumed without deciding that the Span Agreement was an enforceable contract and then found that the agreement required SCD to physically construct a structure to the Hotel to exercise the option and that it had to do so by the time specified in the agreement—December 31, 2020. Since, according to the district court, SCD had not done so nor demonstrated the ability to do so within a reasonable

No. 21-20396

time of that date, the court granted judgment for Mt. Jefferson. SCD timely appeals.

## II.

When considering an appeal, "[w]e need not accept the district court's rationale and may affirm on any grounds supported by the record." *McGruder v. Will*, 204 F.3d 220, 222 (5th Cir. 2000). We therefore consider whether the Span Agreement was enforceable in the first instance, a question the district court did not answer.

In interpreting the Span Agreement, the district court assumed *arguendo* that it was both (1) an enforceable contract, not an unenforceable "agreement to agree," and (2) a unilateral option contract. As to the first assumption, "[i]n general, a contract is legally binding only if its terms are sufficiently definite to enable a court to understand the parties' obligations." *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000). Therefore, "when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree." *Id.* In determining whether an agreement is an enforceable contract or an unenforceable "agreement to agree," we look to see if the agreement "address[es] all of its essential terms" and is "sufficiently definite to confirm that both parties actually intended to be contractually bound." *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016). "[M]aterial and essential terms are those that parties would reasonably regard as 'vitally important ingredient[s]' of their bargain." *Id.* (alteration in original) (quoting *Neeley v. Bankers Tr. Co.*, 757 F.2d 621, 628 (5th Cir. 1985)). "Whether a term is material or essential is a legal question that the court examines on a case-by-case basis." *Coe v. Chesapeake Expl., L.L.C.*, 695 F.3d 311, 320 (5th Cir. 2012).

Turning to the second assumption, "[a]n option contract has two components: (1) an underlying contract that is not binding until accepted and (2) a covenant to hold open to the optionee the opportunity to accept." *N. Shore Energy, L.L.C. v. Harkins*, 501 S.W.3d 598, 606 (Tex. 2016) (quoting *Faucette v. Chantos*, 322 S.W.3d 901, 908 (Tex. App.—Houston [14th Dist.] 2010, no pet.)). This first aspect is critical because "once the option is exercised and the offer accepted within the time specified, the underlying agreement becomes a valid and enforceable bilateral contract." 1 SAMUEL WILLISTON & RICHARD A. LORD, WILLISTON ON CONTRACTS § 5:16 (4th ed. 2007 & Supp. 2022).

We find that the agreement was not sufficiently definite to serve as an enforceable contract but is instead an unenforceable "agreement to agree." There was simply too much left to be determined through future negotiation for the agreement to be enforceable. First, there was no agreement on the location of the connection between the two structures. Common sense suggests, and Texas cases confirm, that location is a material term. *See, e.g.*, *Copano Energy, LLC v. Bujnoch*, 593 S.W.3d 721, 731 (Tex. 2020) (finding location essential in an analogous statute-of-frauds context); *Aurora Petroleum, Inc. v. Cholla Petroleum, Inc.*, No. 07-10-0035-CV, 2011 Tex. App. LEXIS 1382, at *6 (Tex. App.—Amarillo Feb. 23, 2011, no pet.) (location for drilling test wells was an essential term); *MPG Petroleum, Inc. v. Crosstex CCNG Mktg., Ltd.*, No. 13-05-609-CV, 2006 Tex. App. LEXIS 8895, at *10 (Tex. App.—Corpus Christi-Edinburg Oct. 5, 2006, pet. denied) (delivery location was an essential term).

That the agreement put in *some* specification for location by mandating that any connection be on or below the third floor of the Four Seasons does not save the agreement. Even given that constraint, the tunnel or skybridge could still be located anywhere from twenty feet below ground to thirty or forty feet in the air. The structure of the agreement also

demonstrates the essential nature of the location of the connection; it used conditional language to grant the right to connect, but only so long as that connection was in a particular location. And as will become a running theme, the agreement provided no framework for how that location would be chosen—except for by mutual agreement. That is the exact type of "promise to negotiate towards a future bargain" that forms the basis of an unenforceable agreement to agree, not an enforceable contract. *Dall./Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 371 (Tex. 2019).

The same issue exists for the myriad particularities that would go into constructing the connection. The agreement did not specify the design of the connection nor answer any questions about how or when it would be constructed. It is clear that the agreement left those questions open, contemplating that they would be answered in a secondary agreement and even specifying that the owner of the Hotel would be responsible for "fees and expenses incurred . . . in negotiating and reviewing the plans for the Connection." For a construction agreement, the design of what is to be constructed and the manner in which it is to be built are material. *DKH Homes, LP v. Kilgo*, No. 03-10-006-CV, 2011 WL 1811435 (Tex. App.—Austin May 11, 2011, no pet.), is instructive. There, the Texas Court of Appeals was considering an agreement where the buyers of a lot "agree[d] to commence construction of a single family residence . . . on the Property . . . within twelve (12) months" and to use DKH as the contractor. *Id.* at *1. The court found that agreement insufficiently definite because it "[did] not include any of the information essential to define the undertaking such as the size of the house contemplated, the price of the house on a per-square-foot or other basis, or the time for completing the construction." *Id.* at *3. The same is true here. The Span Agreement does not specify the design of the connection, the size of the connection, or even the type of connection

(which could be either a tunnel or a skybridge). It does not specify the time for completing the construction. It does not specify the method of construction or questions of how that construction project will be insured. Each of these is a material term that is to be agreed upon later, rendering the agreement unenforceable.

In addition, and as with location, the agreement does not determine exactly how those decisions are to be made. This is not an agreement where a formula has been provided, with only the inputs left to be plugged in later. *Contra Fischer*, 479 S.W.3d at 241 ("[T]he agreement provided a clear formula or standard by which to determine the payments[.]"). Instead, the agreement requires the parties to negotiate and then mutually agree on the answers to these questions; each of these decisions required "the consent of [the Hotel] Owner." It is not enough that the agreement states that the Hotel owner "will not unreasonably withhold, condition or delay its consent to the construction of the Connection." Texas courts have consistently found that "agreements to negotiate toward a future contract are not legally enforceable . . . even if the party agreed to negotiate in good faith." *Dall./Fort Worth Int'l Airport Bd.*, 576 S.W.3d at 371. Nor is it sufficient that the agreement stated that the secondary agreement "shall generally be in the form of the existing span agreements affecting the [Hotel]." That language provides only a shell for what the future agreement will look like in form; it still does not provide a method for how the decisions themselves will be made. The agreement was an agreement to agree.

Last, considering the agreement as a purported option contract confirms our conclusion. As stated above, an option contract at bottom requires an enforceable underlying contract that goes into effect once the option is triggered. But in this case, the underlying "contract" is simply more negotiations. There is nothing for the court to compel Mt. Jefferson to do once SCD decided to elect its "option." *See Jarvis v. Peltier*, 400 S.W.3d 644,

650 (Tex. App.—Tyler 2013, pet. denied) ("But the option agreement does not give [the buyer] a right to compel [the seller] to sell the property."). And there is no way for a court to determine what decisions the parties would reach in negotiating the secondary span agreement and "no implication of what the parties will agree upon." *Gerdes v. Mustang Expl. Co.*, 666 S.W.2d 640, 644 (Tex. App.—Corpus Christi-Edinburg 1984, no writ.) (quoting *Radford v. McNeny*, 104 S.W.2d 472, 475 (Tex. 1937)). A court would be unable to ensure that SCD's election of the option was honored by enforcing an underlying contract; all it could order is that the parties come back to the negotiating table. *See* 1 Williston on Contracts § 4:29 (4th ed. 2007 & Supp. 2022) ("[I]f an essential element is reserved for the future agreement of both parties . . . the promise can give rise to no legal obligation until such future agreement. Because either party in such a case may, by the very terms of the promise, refuse to agree to anything to which the other party will agree, it is impossible for the law to affix any obligation to such a promise."). In the end, what the parties to the agreement seemed to have sought was leverage in the necessary future negotiations that were required to occur, supported by the specter of litigation. Litigation they may have gotten; an enforceable agreement, they did not. The agreement lacks the material terms necessary for an enforceable agreement and is instead an unenforceable agreement to agree.

### III.

For the foregoing reasons, we AFFIRM the judgment of the district court.