**Opinion issued December 21, 2023**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

## NO. 01-23-00007-CV

———————————

**CITY OF LEAGUE CITY, Appellant**

**V.**

**GALVESTON COUNTY MUNICIPAL UTILITY DISTRICT NO. 6, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case No. 22-CV-0094**

---

## MEMORANDUM OPINION

In this suit between governmental entities, appellee Galveston County Municipal Utility District No. 6 ("MUD 6" or "the District") sued appellant the City of League City seeking declaratory relief and damages for allegedly breaching a

utility agreement and a settlement agreement. The City filed a plea to the jurisdiction, asserting that its governmental immunity from suit had not been waived for any of MUD 6's claims. The trial court denied the City's plea.

In this interlocutory appeal, the City argues that the trial court erred by denying its plea to the jurisdiction because (1) neither contract at issue is a contract that provides for "goods or services" and therefore falls within the waiver of immunity contained in Local Government Code section 271.152; (2) entering into the settlement agreement did not abrogate the City's immunity; and (3) the City did not waive its immunity by its litigation conduct.

We affirm in part and reverse and render judgment in part.

## Background

### A.    *The Relationship Between the Parties and the 1979 Utility Agreement*

MUD 6 is a municipal utility district created under Texas Water Code Chapter 54. *See* TEX. WATER CODE §§ 54.001–.813. MUD 6 "was created, organized and exists for the purpose of furnishing water, sewer and drainage services to the area within its boundaries." The City is a home-rule municipality. A portion of the City lies within the boundaries of MUD 6.

In June 1979, the City and MUD 6 signed the Utility Agreement. In this agreement, the parties acknowledged that MUD 6 was "in the process of acquiring and constructing a water distribution and treatment system and a sewage collection

2

and treatment system[1] to serve the present and future users within the District and works and improvements necessary to properly drain the area within its boundaries."

The Utility Agreement stated:

> In order to provide a water distribution system, sanitary sewer collection system and works and improvements for the drainage of the portion of the City which lies within the boundaries of the District; in order to assure that the District will have the financial capabilities to extend the services to the present and future landowners within the boundaries of the District; in order to secure the commitment of the District to extend the services without discrimination and on the same basis as extension of services made to all other landowners in the District; *and in consideration of the District's acquiring and constructing the systems for the benefit of the City, the City is willing to commit and obligate itself to accept title to the System as provided herein and to provide a source of income to the District to aid it in meeting its obligations to repay principal and interest on the District's unlimited tax bonds* issued to acquire and construct the systems in accordance with the provisions of this Agreement.

(Emphasis added.) In 1981, the parties executed an addendum to the Utility Agreement. The parties amended the language requiring the City to "provide a source of income to the District" to state that the City agreed to "pay to the District as herein provided."

MUD 6 agreed that it would acquire and construct "works, improvements, facilities, plants, equipment[,] and appliances" necessary for the System. To finance

---

[1] In this opinion, we refer to the water distribution and treatment system and the sewage collection and treatment system constructed by MUD 6 pursuant to the Utility Agreement collectively as "the System."

3

the acquisition and construction of the System, MUD 6 agreed to issue bonds "from time to time." MUD 6 could sell bonds "only with the approval of the City Council."

MUD 6 agreed to "extend the water, sewer and drainage systems to serve the future users in the District so ultimately all the land owners within the District will be in a position to receive services from the System." The Utility Agreement described this requirement as a "legal as well as moral obligation to the City to extend the System." With respect to ownership of the System, the Utility Agreement provided:

> As the System is acquired and constructed, the District shall transfer the same to the City, reserving, however, a security interest therein for the purpose of securing the performance of the City under this Agreement. At such time as the District's Bonds issued to acquire and construct the System has been discharged, the District shall execute a release of such security interest and the City shall own the System free and clear of such security interest.

The City agreed that upon accepting completed phases of the System, it would operate and maintain the System at its own expense. The City agreed to "provide service to all users within the District without discrimination." The City further agreed to "fix such rates and charges for customers of the System," and the parties agreed that "[a]ll revenue from the System shall belong exclusively to the City."[2]

The Utility Agreement also set out the City's payment obligation to MUD 6:

---

[2]    In 1981, the parties amended the Utility Agreement to require the City to determine the "Net Revenues" earned from operation of the System for each fiscal year and rebate the Net Revenues to MUD 6.

4

> In consideration of the District's agreeing to acquire and construct the System necessary to provide service for the area within the District, which is also within the City, the City agrees to collect and pay to the District forty percent (40%)[3] of the ad valorem taxes collected by the City in future years on land and improvements thereon within the District during the term of the District's Bonds after deducting the costs of collection. All such funds paid by the City to the District shall be maintained and deposited to a sinking fund account of the District and shall be expended solely for the purpose of retiring the District's bonded indebtedness. Provided the first phase of the System, including the first phase of the sewage treatment plant, has been completed and conveyed to the City, the City's obligation to pay taxes to the District shall begin in the year following the year in which twenty-five (25) houses have been completed in the District. . . . If payments have not begun within five (5) years after the execution of this Agreement, then the City reserves the option to terminate.

The parties agreed that the City's obligation to make tax rebate payments to MUD 6 "shall terminate after the District's Bonds are discharged."

The parties also agreed that any disputes arising out of the Utility Agreement would be settled by arbitration. The Utility Agreement provided that it would remain in effect "from the date of execution hereof for a term of forty (40) years unless otherwise previously terminated pursuant to some term or condition of this Agreement."

---

[3]   A 1981 amendment to the Utility Agreement raised this percentage to 60%, but the amendment also allowed the City to reduce this amount based on a determination of the actual cost to the City of providing services to residents of MUD 6.

### B. *The 2019 Settlement Agreement*

The Utility Agreement remained in effect for nearly the entire forty-year term without major issues arising between the parties. In 2018, however, MUD 6 issued a series of bonds without seeking approval from the City. MUD 6 later sought the City's ratification of this issuance, and it proposed issuing an additional series of bonds in 2019. The City objected to the issuance of both series of bonds because the bonds would not mature until 2030, and the City did not wish to continue making rebate payments to MUD 6 beyond the expiration of the Utility Agreement in 2019.

MUD 6 filed suit against the City in a Galveston County Court at Law, and it sought to compel arbitration under the Utility Agreement. In the arbitration proceeding, the parties disputed whether the City's payment obligation to MUD 6 expired when the Utility Agreement did in 2019 or whether the City was required to continue making rebate payments to MUD 6 until 2024, which was when the last series of bonds issued by MUD 6 and approved by the City would mature. The City asserted counterclaims in the arbitration proceeding seeking declarations that, among other things, the City's payment obligation to MUD 6 expired in June 2019 and that MUD 6 materially breached the Utility Agreement by issuing a series of bonds without the City's approval.

Ultimately, the dispute between the parties was not arbitrated or resolved by a court because the parties reached a Settlement Agreement. In this agreement, the

6

parties recited their opposing positions concerning the bonds and the City's payment obligations. With respect to the City's "future payments" to MUD 6, the parties agreed:

> Notwithstanding the termination of the 40-year term of the Utility Agreement on June 14, 2019, the City agrees to make payments to the District in the years 2020 thru 2024, with the amount of the payment in each year to be the lesser of:
>
> > a)      forty per cent (40%) of the ad valorem taxes collected by the City in that year on land and improvements thereon within the District, after deducting the cost of collection; or
> >
> > b)      the total amount of debt service that the District is required to pay in that year, on bonds that were issued by the District prior to 2018.

The City also agreed that "it has no objection to the District's issuance of its Series 2018 Bonds and its proposed Series 2019 Bonds." The parties also agreed that the purpose of the Utility Agreement "is to provide utility service to the residents of the City residing within the District" and that "the District will transfer and the City will accept as part of its water, sanitary sewer, and drainage system the facilities purchased from proceeds of bonds issued by the District and the City will continue to provide service to such residents as if the Utility Agreement were still in effect."

MUD 6 agreed, in exchange for the City's promise to make the additional payments, that it "fully and finally releases any claims that it may have that the City is obligated to make any additional payments under the Utility Agreement after 2019." The Settlement Agreement specified that the release includes the claims

7

MUD 6 asserted in the county court proceeding and the related arbitration, as well as "all claims that the District has asserted, or could have asserted as of the date this Settlement Agreement is approved by the City Council, against any of the parties released." MUD 6 agreed to nonsuit the county court proceeding with prejudice, and the parties agreed to notify the arbitrator that they had resolved their dispute. Each party warranted that "this Settlement Agreement constitutes a valid and binding obligation on that party, enforceable in accordance with its terms."

## C.     *The Underlying Proceeding*

MUD 6 filed the underlying lawsuit in January 2022 and amended its petition twice in the following months. In its second amended petition, its live pleading, MUD 6 alleged that at the time the parties signed the Settlement Agreement, MUD 6 was not aware that ad valorem taxes received for property in the Magnolia Creek subdivision located within MUD 6 had been erroneously omitted from the City's tax rolls. As a result of this omission, the City allegedly underpaid MUD 6 in tax rebates due under the Utility Agreement for tax years 2017 and 2018. MUD 6 also alleged that the City delayed rebate payments "without explanation or justification" and made payments throughout 2019, 2020, and 2021 that were "significantly less than payments made by the City in prior fiscal or tax years." MUD 6 further alleged that the City had "unilaterally" taken "an offset in year 2021" for an $801,000 payment made in April 2020.

MUD 6 sought declarations that:

(1)     the Settlement Agreement does not alter the City's obligation under the Utility Agreement to make rebate payments in full for tax year 2019;

(2)     the Settlement Agreement does not release unknown claims of MUD 6 for underpaid rebate payments applicable to prior tax years and the Magnolia Creek properties; and

(3)     neither the Utility Agreement nor the Settlement Agreement provides a contractual right or remedy by which the City can unilaterally take an offset. Instead, the Settlement Agreement "plainly requires" the City to pay an amount based on the cap of MUD 6's debt service or 40% of the ad valorem taxes collected by the City that year on land and improvements located within MUD 6.

MUD 6 also asserted two claims for breach of contract. MUD 6 alleged that the City breached the Settlement Agreement by taking an offset in 2021 and by not fully paying rebate payments due under the Utility Agreement in 2019, an obligation that was not excused by the Settlement Agreement. MUD 6 also alleged that the City breached the Utility Agreement by miscalculating and underpaying the rebates due to MUD 6 in tax years 2017 and 2018 for the Magnolia Creek properties. MUD 6 sought monetary relief for its breach of contract claims.

MUD 6 specifically alleged that the City's governmental immunity had been waived in several respects. First, MUD 6 alleged that both the Utility Agreement and the Settlement Agreement were contracts that provided "goods or services" to the City, a local governmental entity, and therefore the statutory immunity waiver found in Local Government Code section 271.152 applied. Second, MUD 6 alleged that

9

the City waived its immunity through its litigation conduct in the county court proceeding because the City did not plead its immunity, asserted counterclaims seeking declaratory relief, and approved the Settlement Agreement. Third, MUD 6 alleged that the City waived its immunity by accepting the benefits of the Settlement Agreement, warranting that that agreement was valid and enforceable, but failing to fulfill its obligations under the Settlement Agreement. Finally, MUD 6 alleged that the City waived its immunity in the underlying proceeding by filing an answer, seeking recovery of its attorney's fees, and asserting a counterclaim in its first amended answer for overpayment of rebate amounts paid to MUD 6.

The City filed an answer and generally denied the allegations in MUD 6's second amended petition. The City asserted several defenses, including the defense of governmental immunity and "offset and credit." With respect to the defense of offset and credit, the City alleged that it "may have overpaid the amount of tax rebates claimed by [MUD 6] in this suit under the Settlement Agreement." The City also sought recovery of its attorney's fees.

The City filed a "Plea to the Jurisdiction and Special Exceptions" in response to MUD 6's second amended petition.[4] In its plea to the jurisdiction, the City argued that its governmental immunity from suit was not waived by Local Government

---

[4] The City also filed pleas to the jurisdiction in response to MUD 6's original petition and MUD 6's first amended petition. The trial court only ruled on the City's plea to the jurisdiction to MUD 6's second amended petition.

Code section 271.152 because neither the Utility Agreement nor the Settlement Agreement were contracts for the provision of goods or services. The City argued that under caselaw interpreting section 271.152, a contract for services must give the governmental entity the right to receive a direct, unattenuated benefit, but the Utility Agreement confers no such right on the City.

According to the City, only MUD 6 and the citizens served by that district receive any benefits under the Utility Agreement. Although the City eventually receives title to any facilities constructed under the Utility Agreement, this is not a benefit to the City because the City must take on additional expenses to operate and maintain the facilities. Additionally, the City argued that although it may receive additional revenue through customer payments, this is only an indirect and attenuated benefit. Furthermore, the City argued that all actions contemplated by the Utility Agreement were "contingencies," and even if transfer of the facilities could be construed as a benefit, that benefit was too "contingent and attenuated." The City also argued that the Settlement Agreement itself was not a contract for goods or services, nor could MUD 6 rely on the fact that the parties entered into the Settlement Agreement to resolve claims related to the Utility Agreement because the Utility Agreement was not a contract for goods or services.

The City acknowledged that the Texas Supreme Court and this Court have, on occasion, recognized waiver of immunity "by conduct," but it argued that these

instances are limited and involve exceptional circumstances not present in this case. Specifically, this case involved an "ordinary contract dispute" and did not involve any misleading or fraudulent conduct on the City's part. The City also argued that all of its litigation conduct in the underlying proceeding was defensive in nature and did not serve as a waiver of immunity.[5] The City attached evidence to its plea to the jurisdiction, including the Settlement Agreement (which incorporated the Utility Agreement by reference); an affidavit from John Baumgartner, the City's city manager, in which he averred that MUD 6 has transferred the System to the City; the transcript of Baumgartner's deposition; and the transcript of a hearing on various pretrial motions filed by the parties.

In response, MUD 6 argued that both the Utility Agreement and the Settlement Agreement were contracts that provided goods or services under section 271.152 because both contracts conferred direct benefits on the City. MUD 6 also argued that the City waived immunity "over a suit involving the Utility Agreement" by failing to assert immunity in the county court proceeding, which ultimately concluded with entry of the Settlement Agreement. Moreover, the City asserted

---

[5] The City also asserted special exceptions along with its plea to the jurisdiction. Specifically, the City specially excepted to the portions of MUD 6's second amended petition that alleged claims for declaratory relief. The trial court did not rule on the City's special exceptions, and the City does not assert this failure to rule as a basis for reversal of the trial court's order denying the City's plea to the jurisdiction.

affirmative counterclaims in the county court proceeding. MUD 6 also argued that because immunity was waived for claims involving breach of the Utility Agreement, immunity was also waived for claims of breach of the Settlement Agreement, as that contract arose from allegations that the Utility Agreement had been breached. MUD 6 also attached evidence, including the City's statement of issues filed in the arbitration proceeding; the City's answer in the county court proceeding; the City's answer and statement of counterclaims in the arbitration; and the City's "Long Range Financial Forecast" for Fiscal Years 2019 through 2023, which reflected that payments from water customers represented a significant portion of the City's revenue.

After a hearing, the trial court denied the City's plea to the jurisdiction to MUD 6's second amended petition. This accelerated appeal followed. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (providing that party may appeal from interlocutory order that grants or denies plea to jurisdiction by governmental unit).

## Governmental Immunity

In its sole issue on appeal, the City argues that the trial court erred by denying its plea to the jurisdiction because none of the waivers of governmental immunity alleged by MUD 6 applied to waive the City's immunity in this case.

13

## A.     *Standard of Review*

"Governmental immunity generally deprives a trial court of subject-matter jurisdiction over suits against the government unless the state consents to the suit." *Fraley v. Tex. A&M Univ. Sys.*, 664 S.W.3d 91, 96 (Tex. 2023); *Gulf Coast Ctr. v. Curry*, 658 S.W.3d 281, 284 (Tex. 2022) ("Immunity from suit thus presents a jurisdictional question of whether the State has expressly consented to suit."). The plaintiff bears the burden to affirmatively demonstrate the trial court's jurisdiction, which encompasses the burden of establishing a waiver of sovereign immunity in suits against the government. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019); *see Curry*, 658 S.W.3d at 284. Only the Legislature can waive governmental immunity from suit, and it must express that intent in clear and unambiguous language. *Dallas/Fort Worth Int'l Airport Bd. v. Vizant Techs., LLC*, 576 S.W.3d 362, 367 (Tex. 2019).

A party challenging subject-matter jurisdiction may challenge the pleadings, the existence of jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). When either party presents evidence in connection with a jurisdictional plea, the trial court should consider that evidence in addition to challenges to the pleadings. *Fraley*, 664 S.W.3d at 97; *see Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000) ("[A] court deciding a plea to the

14

jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

We review de novo a challenge to the trial court's subject-matter jurisdiction based on a failure to demonstrate that governmental immunity has been waived. *Fraley*, 664 S.W.3d at 97; *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004) ("Whether a court has subject matter jurisdiction is a question of law."). When reviewing evidence in connection with a jurisdictional plea, we view the evidence in a light favorable to the nonmovant, indulging reasonable inferences from the evidence in the nonmovant's favor. *Fraley*, 664 S.W.3d at 97. "To avoid dismissal, a plaintiff must establish that jurisdiction exists as a matter of law or raise a fact issue that overcomes the jurisdictional challenge that is intertwined with the merits." *Id.*

**B.** **Whether the Utility Agreement is a Contract for "Goods or Services" Under Local Government Code Chapter 271**

Local Government Code Chapter 271 addresses the purchasing and contracting authority of municipalities such as the City. *See* TEX. LOC. GOV'T CODE §§ 271.001–.908. Section 271.152 provides:

> A local governmental entity that is authorized by statute or the constitution to enter into a contract and that enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter.

*Id.* § 271.152; *San Antonio River Auth. v. Austin Bridge & Rd., L.P.*, 601 S.W.3d 616, 625 (Tex. 2020). Section 271.151 defines "contract subject to this subchapter" as "a written contract stating the essential terms of the agreement for providing goods or services to the local governmental entity that is properly executed on behalf of the local governmental entity."[6] TEX. LOC. GOV'T CODE § 271.151(2)(A); *Vizant Techs.*, 576 S.W.3d at 368. The only element of this definition that is at issue in this appeal is whether the relevant contracts—the Utility Agreement and the Settlement Agreement—provide for "goods or services" to the City.

Although the Local Government Code does not define "services" as used in section 271.151(2)(A), the Texas Supreme Court has held that this term is "broad enough to encompass a wide array of activities" and "includes generally any act performed for the benefit of another." *San Antonio River Auth.*, 601 S.W.3d at 628–29 (quoting *Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 839 (Tex. 2010)); *see Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Tex. Pol. Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 327 (Tex. 2006) (concluding that chapter 271's immunity waiver applied because members elected self-insurance fund's governing board and board subcommittee resolved claims

---

[6] Section 271.151 also defines "contract subject to this subchapter" as "a written contract, including a right of first refusal, regarding the sale or delivery of not less than 1,000 acre-feet of reclaimed water by a local governmental entity intended for industrial use." TEX. LOC. GOV'T CODE § 271.151(2)(B). The parties agree that this definition is not at issue in this case.

16

disputes, and thus members provided services to fund). The agreement to provide services to the governmental unit "need not be the primary purpose of the agreement." *Byrdson Servs., LLC v. S.E. Tex. Reg'l Planning Comm'n*, 516 S.W.3d 483, 485 (Tex. 2016) (quoting *Kirby Lake*, 320 S.W.3d at 839).

By contrast, chapter 271 does not apply to a contract that provides only an "indirect, attenuated benefit" to the local government. *San Antonio River Auth.*, 601 S.W.3d at 629 (quoting *Kirby Lake*, 320 S.W.3d at 839); *Lubbock Cnty. Water Control & Improvement Dist. v. Church & Akin, L.L.C.*, 442 S.W.3d 297, 303 (Tex. 2014). The Texas Supreme Court has reasoned that "[w]hen a party has no right under a contract to receive services, the mere fact that it may receive services as a result of the contract is insufficient to invoke chapter 271's waiver of immunity." *Church & Akin*, 442 S.W.3d at 303; *W. Travis Cnty. Pub. Util. Agency v. Travis Cnty. Mun. Util. Dist. No. 12*, 537 S.W.3d 549, 555 (Tex. App.—Austin 2017, pet. denied). In such a situation, the services received are, "[a]t best," only an "indirect" or "attenuated" benefit under the contract. *Church & Akin*, 442 S.W.3d at 303 (concluding that plaintiff's operation of marina on property leased from water district conferred only indirect benefit on water district when lease agreement did not obligate plaintiff to operate marina).

The Texas Supreme Court has also noted that chapter 271 limits recovery by a successful claimant to "the balance due and owed by the local governmental entity

under the contract," attorney's fees, and interest. *Id.* at 304 (quoting TEX. LOC. GOV'T CODE § 271.153(a)(1), (3)). Therefore, chapter 271's immunity waiver "will typically apply only to contracts in which the governmental entity agrees to pay the claimant for the goods or services that the claimant agrees to provide to the governmental entity." *Id.* Although "a party may agree to provide goods or services in exchange for something other than payment, the absence of any agreement by the governmental entity to pay for goods or services may indicate that the claimant did not in fact agree to provide goods or services to the governmental entity." *Id.* at 305.

The City argues that the Utility Agreement is not an "agreement for providing goods and services" because the contract does not confer any direct benefits on the City. It argues that, instead, the parties entered into the Utility Agreement to help MUD 6 fulfill its obligations to its residents, and therefore the agreement benefits MUD 6 and not the City.

In the Utility Agreement, MUD 6 agreed to design and construct the water, sewer, and drainage facilities within its boundaries that make up the System. MUD 6 agreed to construct the System in stages "as is economically feasible," and it agreed to submit all plans and specifications to the City for approval before beginning construction of each part of the System. MUD 6 further agreed to issue bonds "from time to time" to provide financing to acquire and construct the System.

The Utility Agreement provided as follows with respect to the ownership and operation of the System:

> Section 7.01: <u>Ownership by City</u>. As the System is acquired and constructed, the District shall transfer the same to the City, reserving, however, a security interest therein for the purpose of securing the performance of the City under this Agreement. At such time as the District's Bonds issued to acquire and construct the System has been discharged, the District shall execute a release of such security interest and the City shall own the System free and clear of such security interest.
>
> Section 7.02: <u>Operation by City</u>. As construction of each phase of the System is completed, representatives of the City shall inspect the same and, if the City finds that the same has been completed in accordance with the final plans and specifications, the City will accept the same whereupon such portion of the System shall be operated and maintained by the City at its expense as provided herein. In the event the System has not been completed in accordance with the final plans and specifications the City will immediately advise the District in what manner said System does not comply and the District shall immediately correct the same whereupon the City shall again inspect the System and accept the same if the defects have been corrected. During the term of this Agreement the City will operate the System and provide service to all users within the District without discrimination. . . .

The City agreed to maintain the System "in good condition and working order," and it agreed to operate the system "in an efficient and economical manner at a reasonable cost and in accordance with the sound business principles." The City also agreed to set the rates and charges for customers of the System, and the Utility Agreement provided that "[a]ll revenue from the System shall belong exclusively to the City."

The Utility Agreement also required the City to pay consideration for MUD 6's "agreeing to acquire and construct the System necessary to provide service for the area within the District, which is also within the City." Specifically, the City agreed to collect and pay to MUD 6 a percentage of the ad valorem taxes "collected by the City in future years on land and improvements thereon within the District during the term of the District's Bonds after deducting the costs of collection." MUD 6 agreed to maintain these rebate payments in a sinking fund and to use these payments "solely for the purpose of retiring the District's bonded indebtedness." The City's obligation to make these payments "shall terminate after the District's Bonds are discharged."

Thus, under the Utility Agreement, MUD 6 promised to design and construct the System in stages and convey the completed portions of the System to the City, which would own the System free and clear of any liens and free and clear of MUD 6's security interest upon discharge of MUD 6's bond indebtedness. In consideration, the City agreed to pay to MUD 6 a percentage of the ad valorem taxes collected on land and improvements within the boundaries of MUD 6. The parties presented evidence to the trial court that MUD 6 had conveyed the System to the City and that the City had made rebate payments to MUD 6. We therefore agree with MUD 6 that the Utility Agreement provided for "goods and services" under chapter 271. *See* TEX. LOC. GOV'T CODE § 271.151(2)(A); *Kirby Lake*, 320 S.W.3d at 832–

33, 839 (holding that contracts providing that developers would build water and sewer facilities according to water authority's specifications, developers would lease facilities to authority until authority purchased them, and authority would reimburse developers' construction costs upon receipt of voter-approved bond funds were contracts that contemplated provision of services under chapter 271); *NBL 300 Grp. Ltd. v. Guadalupe-Blanco River Auth.*, 537 S.W.3d 529, 531–32, 534 (Tex. App.—San Antonio 2017, no pet.) (concluding that contract providing that developer would construct wastewater systems and oversee engineering, design, and construction of improvements to properties and river authority would reimburse developer for connections to wastewater systems through increasing connection fees charged to consumers was contract for goods or services); *Joshua Dev. GP, LLC v. Johnson Cnty. Special Util. Dist.*, No. 10-20-00183-CV, 2022 WL 16839691, at *5 (Tex. App.—Waco Nov. 9, 2022, no pet.) (mem. op.) (concluding that contract requiring developer to construct several different water and sewer stations, mains, and lines, pay certain fees, and provide design and engineering services before title to water-related infrastructure was conveyed to governmental entity provided for goods and services under chapter 271).

We disagree with the City that any benefits received by the City are too indirect or attenuated to constitute a contract that provides for goods or services under chapter 271. Although the primary purpose of the Utility Agreement was to

facilitate the acquisition and construction of phases of the System so that water, sewer, and drainage services could be provided to residents of MUD 6, the City received a direct benefit under the Utility Agreement: the construction of the System which was intended to—and did—become a part of the City's infrastructure when MUD 6 conveyed the System to the City. MUD 6 designed, paid for, and constructed the System, and the City obtained title to the System.

The reality that the City must now expend funds to operate and maintain the System does not strip the System of its status as a benefit that the City received under the Utility Agreement. *See San Antonio River Auth.*, 601 S.W.3d at 628–29 (noting that "services," as used in chapter 271, is "broad enough to encompass a wide array of activities" and "includes generally any act performed for the benefit of another"). A contract for goods or services does not cease to be a contract for goods and services simply because the buyer later regrets the purchase. Regardless, the Utility Agreement clearly articulated the monetary benefit that the City would obtain from owning the System: "All revenue from the System" and "[t]he connection charge shall belong exclusively to the City." MUD 6's jurisdictional evidence included the City's "Long Range Financial Forecast" for fiscal years 2019 through 2023, which demonstrated that City officials projected "Water & Wastewater Revenue" to be the City's second largest revenue source for each fiscal year. These are direct benefits to the City.

These key contractual features make this case analogous to *Joshua Development*. Under the contract at issue in that case, Joshua Development's predecessor agreed to construct a groundwater storage facility and pump station, sewer lift stations, water mains, and all water and sewer lines within a proposed subdivision. 2022 WL 16839691, at *1. The developer also agreed to pay a certain amount "as full satisfaction of all impact fees for the Subdivision" and agreed to convey title to the infrastructure to the Special Utility District's predecessor. *Id.* The Special Utility District's predecessor agreed to extend an existing water main to the groundwater storage facility and provide water and sewer service to the homes in the subdivision. *Id.*

The Waco Court of Appeals concluded that the contract provided for goods and services under chapter 271:

> As noted previously, the Contract required that Heritage, Joshua's predecessor-in-interest, construct a ground water storage facility and pump station, sewer lift stations, force mains, water main, all water and sewer lines within the Subdivision, and pay $142,760 as full satisfaction of all impact fees for the Subdivision. Joshua also provided design and engineering services for the construction of the infrastructure and paid a construction contractor to complete the infrastructure. In return, JCSUD's predecessor-in-interest, JSFWSD agreed to extend and connect an existing water main to the ground water storage facility and provide water and sewer service to the homes pursuant to its rates and policies. Furthermore, the Contract provided that, upon completion and final walk-through by JCFWSD representatives, title to the infrastructure constructed by Heritage conveyed to JCFWSD, which was then transferred to JCSUD. Given this, we conclude that the Contract provided for "goods and services,"

23

as contemplated in chapter 271 and by the Texas Supreme Court in *Kirby Lake*.

*Id.* at *5. The court also noted that "by acquiring title to the infrastructure constructed by Heritage, JCSUD derived a direct, rather than attenuated, benefit as a result of the Contract that aids JCSUD in satisfying its legal requirement to provide water and sewer service to the Joshua Meadows subdivision." *Id.* As in *Joshua Development*, the City's acquisition of title to the infrastructure is a direct benefit that brings the contract within chapter 271's waiver of immunity.

The City's authorities are distinguishable on this point. In *City of San Antonio ex rel. San Antonio Water System v. Campbellton Road, Ltd.*, in exchange for the SAWS's agreement to provide sewer service to a proposed residential subdivision, Campbellton agreed to participate in construction of an oversized wastewater consolidation system designed to accommodate Campbellton's proposed development and dedicate the system to SAWS. *See* 647 S.W.3d 751, 754–55 (Tex. App.—San Antonio 2022, pet. granted). The San Antonio Court of Appeals held that the contract at issue did not fall within chapter 271 because the increased capacity added to SAWS's wastewater system was not for SAWS's direct benefit; instead, the increased capacity benefitted the proposed subdivisions. *Id.* at 759–61. Here, by contrast, the City received a more direct benefit under the Utility Agreement: title to the System and the revenue derived from use of the System.

24

*West Travis County Public Utility Agency v. Travis County Municipal Utility District No. 12*, involved two contracts: (1) a "raw water" contract, in which the Lower Colorado River Authority—the Agency's predecessor—agreed to provide MUD 12 with raw water from the Colorado River; and (2) a "wholesale water services agreement," in which LCRA agreed to provide MUD 12 with "wholesale services for the treatment of raw water and delivery of potable water." *See* 537 S.W.3d at 551–52. The wholesale services contract required MUD 12 to install a "Master Meter" near the delivery point for the water. *Id.* at 552. MUD 12 would convey the Master Meter to LCRA free and clear of any liens, the Master Meter would become part of LCRA's system, and LCRA agreed to repair and maintain the Master Meter. *Id.* The wholesale services contract provided that it became effective only after LCRA accepted the Master Meter. *Id.*

After a dispute arose between the parties concerning the Agency's rates, MUD 12 filed suit for breach of the wholesale services contract. *Id.* at 553. The Austin Court of Appeals held that this contract was not a contract that provided goods or services under chapter 271. *See id.* at 555–57. The court reasoned that the contract gave the Agency no contractual right to receive any services from MUD 12. *Id.* at 555. Instead, "[t]he contracted-for right to receive services (water treatment and delivery) flowed in the *opposite* direction (from the Agency to MUD 12), for the express purpose of enabling MUD 12 to meet its own obligations to its retail

customers." *Id.* Moreover, even if conveyance of the Master Meter to the Agency constituted a "service" under the broad definition of that term, the Agency did not have a contractual *right* to receive that service because it was a condition precedent to the contract's formation. *Id.* Additionally, the contract was silent on two essential terms relating to the purported agreement to provide meter installation services—price and time of performance—so the Austin Court therefore concluded that the contract did not state the essential terms of an agreement by MUD 12 to provide services to the Agency. *Id.* at 557.

Unlike in *West Travis County Public Utility Agency*, a primary purpose of the Utility Agreement was the acquisition and construction of the System. The Utility Agreement required MUD 6 to issue bonds to finance construction of the System in stages. After MUD 6 completed construction of a phase, it would convey the phase to the City, which would take over operation and maintenance. The Utility Agreement stated that it "shall be in force and effect from the date of execution hereof [June 14, 1979] for a term of forty (40) years." Construction of the System therefore was not a condition precedent to formation of the Utility Agreement.

Additionally, the Utility Agreement required the City to pay consideration to MUD 6 for construction of the System: a specified percentage of ad valorem taxes collected by the City on land and improvements located within MUD 6's boundaries for each year until discharge of MUD 6's bond indebtedness. The Utility Agreement

therefore stated a price for construction of the System, which is the service that MUD 6 provided to the City.

The City also cites *M.E.N. Water Supply Corp. v. City of Corsicana*, which involved a dispute over rates charged by the City of Corsicana under a contract for wholesale water sales to non-residents of the city. 564 S.W.3d 474 (Tex. App.—Waco 2018, pet. denied). The Water Supply Corporations argued for a chapter 271 immunity waiver on the ground that they provided "numerous services" to the city "including the construction of storage, pumping, and pressure maintenance or other facilities . . . ." *Id.* at 490. It is not clear whether the facilities were to be conveyed to the City of Corsicana or whether the city was to become responsible for operating and maintaining the facilities.

The Waco Court of Appeals concluded that the "central purpose" of the contract was "indisputably Corsicana's sale of wholesale water to the Water Supply Corporations, not vice versa." *Id.* Any "services" by the Water Supply Corporations contemplated under the contract were "merely actions that are necessary to facilitate the procurement of water by the Water Supply Corporations for their customers." *Id.* The Waco Court therefore held that the Water Supply Corporations' claims for breach of contract did not fall within chapter 271's waiver of immunity. *Id.*

Here, although the City agreed to provide potable water to the residents of MUD 6, the Utility Agreement is not merely a contract for the provision of water.

That is one purpose of the Utility Agreement, but it is not the only purpose. The design and construction of the System by MUD 6—and the subsequent conveyance of the System to the City—are significant features of the Utility Agreement.

Finally, in *City of Crawford v. DCDH Development, LLC*, the parties executed a developer agreement, under which DCDH agreed to construct an extension to the City of Crawford's water system for a subdivision within the city's extraterritorial jurisdiction in exchange for the city's promise to annex the subdivision and provide water services. No. 13-20-00281-CV, 2022 WL 868056, at *1 (Tex. App.—Corpus Christi–Edinburg Mar. 24, 2022, no pet.) (mem. op.). Although it is unclear whether the City of Crawford agreed to take title to the water system extension upon its completion, the developer agreement did provide that the extension would be "dedicate[d]" to the city. *Id.* at *9 n.7.

The Corpus Christi Court of Appeals concluded that the developer agreement was not a contract that provided for goods or services under chapter 271 because the "central purpose" of the agreement was "the City's provision of water service to DCDH's property, the Stuth Farms Subdivision, not vice versa." *Id.* at *9. "Any services contemplated under the Developer Agreement by DCDH, such as the indemnity obligations, are at best indirect or attenuated benefits to the City." *Id.* The court also stated that "any services contemplated" by DCDH were "merely mechanisms to facilitate the City providing water to the subdivision." *Id.* The court

28

further noted that the developer agreement did not require the City to purchase anything from DCDH, and the only monetary provisions in the agreement concerned various fees paid by DCDH. *Id.*

This case is distinguishable. *City of Crawford* does not indicate whether the developer agreement had terms similar to the Utility Agreement providing that, upon completion, the city would take title to the newly constructed water system extension free and clear of any liens or security interests. Additionally, unlike the developer agreement, the plain language of the Utility Agreement required the City to make payments to MUD 6 "[i]n consideration" for MUD 6's acquisition and construction of the System. As such, the Utility Agreement is a contract for goods and services for purposes of chapter 271's immunity waiver. *See* TEX. LOC. GOV'T CODE §§ 271.151(2)(A), 271.152. We conclude that the trial court did not err by denying the City's plea to the jurisdiction on MUD 6's claim for breach of the Utility Agreement.

C.   *Whether Entering into the Settlement Agreement Waives the City's Immunity*

The City contends that its immunity for claims with respect to the Settlement Agreement is not waived because (1) the Settlement Agreement is not a contract that provides for goods or services under chapter 271, and (2) its immunity was not waived in the dispute under the Utility Agreement that led to execution of the

29

Settlement Agreement, and thus immunity is also not waived for claims involving the Settlement Agreement.

In *Texas A&M University-Kingsville v. Lawson*, the Texas Supreme Court addressed whether a governmental entity, after agreeing to settle a lawsuit from which it is not immune, can claim immunity from suit for breach of the settlement agreement. *See* 87 S.W.3d 518 (Tex. 2002) (plurality op.). In that case, Lawson, a former faculty member at Texas A&M Kingsville, asserted several claims against the university, including a claim for violations of the Whistleblower Act and constitutional claims. *Id.* at 518–19. The university filed a plea to the jurisdiction based on sovereign immunity, and the trial court sustained the plea except as to Lawson's Whistleblower Act claim and constitutional claims for equitable relief. *Id.* The parties then reached a settlement agreement. *Id.* Lawson then sued the university for breach of the settlement agreement. *Id.* The university again filed a plea to the jurisdiction arguing that sovereign immunity barred the claim for breach of the settlement agreement, but the trial court denied the plea. *Id.*

The Texas Supreme Court acknowledged that the Legislature has waived sovereign immunity for suits alleging violations of the Whistleblower Act and certain suits for breach of contract. *Id.* at 521. A suit for breach of a settlement agreement "does not fall within any such waiver or administrative process for contractual claims." *Id.* However, Lawson had asserted a claim under the

30

Whistleblower Act and because the Legislature had waived immunity for this claim, Lawson was "entitled to sue the University for violating the statute and if he prevailed, to hold the University liable." *Id.* The court reasoned:

> We agree with the trial court that when a governmental entity is exposed to suit because of a waiver of immunity, it cannot nullify that waiver by settling the claim with an agreement on which it cannot be sued. The government cannot recover waived immunity by settling without defeating the purpose of the waiver in the first place. Such a rule would limit settlement agreements with the government to those fully performed before dismissal of the lawsuit because any executory provision could not thereafter be enforced. One can easily envision circumstances like those now before us when settlement on terms acceptable to the parties either would not be possible or would delay dismissal of the lawsuit. We do not think the Legislature intended by waiving the bar of immunity for claims under the Whistleblower Act that settlements would be prevented or delayed by a revival of the bar in the form of immunity from suit for breach of settlement agreements. While it is certainly true, as the University argues, that a suit for breach of a settlement agreement is separate and apart from the suit on the settled claim, enforcement of a settlement of a liability for which immunity is waived should not be barred by immunity.

*Id.* The court further stated, "Once the Legislature has decided to waive immunity for a class of claims, the inclusion of settlements within the waiver is consistent with that decision." *Id.* at 522. Ultimately, the Texas Supreme Court concluded that because the university's immunity from suit had been waived under the Whistleblower Act, the university "may not now claim immunity from a suit brought to enforce a settlement agreement reached to dispose of a claim brought under that Act." *Id.* at 522–23.

31

This Court has applied *Lawson* and held that a governmental entity does not retain immunity over a claim for breach of a settlement agreement that arises out of a claim for which the entity's immunity was waived. In *Porretto v. Patterson*, the plaintiffs sued the General Land Office and its commissioner, asserting a takings claim, a trespass to try title claim, and a claim for breach of a settlement agreement. *See* 251 S.W.3d 701, 706 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The trial court granted the General Land Office's plea to the jurisdiction. *Id.* On appeal, this Court held, first, that the trial court erred by dismissing the plaintiffs' takings claim "[b]ecause the state and federal constitutions grant authority to landowners to seek compensation for government takings." *Id.* at 710. Citing *Lawson*, we then agreed with the plaintiffs that because the General Land Office was not immune from the takings claim, the plaintiffs' claim for breach of the settlement agreement could proceed, "but only to the extent it arises out of the takings claim." *Id.* at 712. We therefore reversed the trial court's plea to the jurisdiction on the plaintiffs' breach of contract claim. *Id.*; *see also Harris Cnty. Hous. Auth. v. Rankin*, 414 S.W.3d 198, 205 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("[T]he Housing Authority, having waived immunity from suit by contracting for services with Rankin, may not now claim immunity from suit brought to enforce an agreement that settled claims arising under that contract for services.").

32

Here, MUD 6 first brought suit against the City in 2018 and alleged breach of the Utility Agreement. Although the parties initiated arbitration proceedings, the parties resolved their disputes before an arbitration hearing and executed the Settlement Agreement in 2019. Under that agreement, the City agreed to make certain future payments to MUD 6 and it agreed that it had no objection to MUD 6's Series 2018 and Series 2019 bonds. The parties also agreed that MUD 6 "fully and finally releases any claims that it may have that the City is obligated to make any additional payments under the Utility Agreement after 2019, other than the payments" specifically described in the Settlement Agreement. Several years later, MUD 6 filed the underlying proceeding, alleging that the City had breached both the Utility Agreement and the Settlement Agreement.

As stated above, the City's immunity is waived for a claim for breach of the Utility Agreement. Because the City's immunity is waived under chapter 271 for a claim for breach of the Utility Agreement, the City "may not now claim immunity from a suit brought to enforce a settlement agreement reached to dispose of a claim brought under" chapter 271. *See Lawson*, 87 S.W.3d at 522–23; *Rankin*, 414 S.W.3d at 205; *Porretto*, 251 S.W.3d at 712. We conclude that the trial court did not err by denying the City's plea to the jurisdiction on MUD 6's claim for breach of the Settlement Agreement.

33

***D.*** ***Whether Immunity Has Been Waived for MUD 6's Declaratory Judgment Claims***

Finally, the City argues that the trial court erred by denying its plea to the jurisdiction on MUD 6's claims for declaratory relief because the immunity waiver in section 271.152 does not apply to declaratory judgment claims.

Under the Declaratory Judgments Act ("DJA"), a person interested under a written contract "may have determined any question of construction or validity arising under" the contract and "obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE § 37.004(a). The DJA does not contain a general waiver of sovereign immunity, instead providing only a limited waiver for challenges to the validity of an ordinance or statute. *Town of Shady Shores*, 590 S.W.3d at 552. DJA claims "requesting other types of declaratory relief are barred absent a legislative waiver of immunity with respect to the underlying action." *Id.* at 553; *Tex. Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621–22 (Tex. 2011) (per curiam) (stating that DJA "does not enlarge the trial court's jurisdiction but is merely a procedural device for deciding cases already within a court's jurisdiction") (internal quotations omitted).

Under section 271.152, a local governmental entity that "enters into a contract subject to this subchapter waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter." TEX. LOC. GOV'T CODE § 271.152. The San Antonio Court of

34

Appeals has pointed out that while nothing in section 271.152 "*excludes* declaratory judgment actions based on written contracts from the statutory waiver," nothing in the statute "expressly includes declaratory judgment claims." *Lower Colorado River Auth. v. City of Boerne*, 422 S.W.3d 60, 67 (Tex. App.—San Antonio 2014, pet. dism'd).

In *Lower Colorado River Authority*, LCRA filed suit against the City of Boerne and sought a declaration confirming that it had not breached a wholesale power agreement or its enabling legislation. *See id.* at 63. LCRA also asserted a claim for breach of contract and sought damages. *Id.* The City of Boerne filed a plea to the jurisdiction challenging both claims. *Id.* The trial court granted the plea as to the declaratory judgment claim but denied it as to the breach of contract claim. *Id.* On appeal, LCRA argued that its declaratory judgment claim "is a claim which seeks to 'adjudicate[] a claim for breach of contract' within the meaning of section 271.152," and therefore this claim fell within section 271.152's waiver of immunity. *Id.* at 67 (quoting TEX. LOC. GOV'T CODE § 271.152).

The San Antonio Court of Appeals agreed with the City of Boerne that LCRA's declaratory judgment claim did not fall within the statutory waiver because it was not "for the purpose of adjudicating a claim for breach of contract." *Id.* The court noted that the Texas Supreme Court has stated that "Chapter 271 only waives immunity for suits that seek the remedies specifically set out in the statute." *Id.*

(citing *Tooke v. City of Mexia*, 197 S.W.3d 325, 345 (Tex. 2006)); *see* TEX. LOC. GOV'T CODE § 271.153 (specifying limitations on awards of money judgments "for breach of a contract subject to this subchapter" and providing that certain types of damages are not recoverable). Because the plain language of section 271.152 did not "expressly and unambiguously waive[] immunity from suit for a declaratory judgment claim," the trial court did not err by granting the City of Boerne's plea to the jurisdiction on that claim. *Lower Colorado River Auth.*, 422 S.W.3d at 67. The court noted, however, that because the trial court denied the plea to the jurisdiction on LCRA's breach of contract claim, a claim for which section 271.152 expressly waived immunity, "LCRA will be permitted to adjudicate the breach of contract issue when the trial resumes." *Id.*

We agree with the San Antonio Court of Appeals. Section 271.152 "waives sovereign immunity to suit for the purpose of adjudicating a claim for breach of the contract, subject to the terms and conditions of this subchapter," but it does not expressly waive immunity from suit for adjudicating a claim for declaratory relief. *See* TEX. LOC. GOV'T CODE § 271.152; *Lower Colorado River Auth.*, 422 S.W.3d at 67; *see also Nat'l Pub. Fin. Guarantee Corp. v. Harris Cnty.-Houston Sports Auth.*, 448 S.W.3d 472, 484 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (concluding that chapter 271's immunity waiver did not extend to plaintiff's declaratory relief claim against particular defendant when plaintiff did not assert breach of contract

claim against that defendant, but citing *Lower Colorado River Authority* as support).

We conclude that MUD 6 has not established that its claims for declaratory relief fall within a waiver of immunity. *See Town of Shady Shores*, 590 S.W.3d at 550 (stating that plaintiff bears burden to affirmatively demonstrate trial court's jurisdiction, which encompasses burden of establishing waiver of sovereign immunity in suits against government). We hold that the trial court erred by denying the City's plea to the jurisdiction on MUD 6's claims for declaratory relief.

We sustain the City's sole issue in part.

**Conclusion**

We reverse the portion of the trial court's order that denies the City's plea to the jurisdiction on MUD 6's claims for declaratory relief, and we render judgment dismissing those claims for lack of subject-matter jurisdiction. We affirm the remainder of the trial court's order denying the City's plea to the jurisdiction.

April L. Farris
Justice

Panel consists of Justices Kelly, Landau, and Farris.